UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SAMMIE L. PHILLIPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 99 C 2152 |
| v. | ) | |
| | ) | Judge Mark Filip |
| THE RAYMOND CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER AND MEMORANDUM OPINION

Sammie Phillips ("Plaintiff" or "Phillips") brings this four-count civil action against The Raymond Corporation ("Defendant" or "Raymond"). The action stems from an accident in which Phillips was involved while working on a forklift manufactured by Raymond. (D.E. 1, Ex. A.)[1] Counts One and Three assert that Raymond is strictly liable for Phillips's injury, while Counts Two and Four assert that Raymond was negligent in its maintenance and sale of the forklift. (*Id.*) Raymond removed this case from the Circuit Court of Cook County in April 1999. (D.E. 1.) This Court inherited the case in 2004.

Phillips and Raymond seek to introduce the testimony of two experts each. Each party has moved to strike the opposing party's experts, and the Court now rules upon those motions. As explained below, Raymond's motion to strike is granted in part and denied in part, and Phillips's motions are denied. Specifically, this Court excludes the testimony of putative expert John Sevart, who was precluded from testifying in a similar case—*see Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 867 (7th Cir. 2001) (affirming

---

[1] The various docket entries in this case are cited as "D.E. __."

exclusion of Sevart testimony)—as well as any testimony derived from Sevart's putative testimony. In all other respects, the Court denies the motions.

## BACKGROUND FACTS

During the early months of 1996, Phillips was employed at the Jewel Food Stores warehouse in Melrose Park, Illinois. (D.E. 1, Ex. A ¶ 3.) On April 2, 1996, Phillips was operating a stand-up forklift in connection with his normal work duties. (*Id.* ¶ 4.) He was driving a Model 31i forklift manufactured by Raymond. (*Id.* ¶ 3.) It is a stand-up, rear-entry forklift. (*Id.*) The forklift had a doorless opening in the back of the forklift through which the driver of the forklift would pass when entering or leaving the machine. (*Id.*) Phillips claims that during his shift, while traveling in reverse, he unknowingly struck a "wood chip" with a wheel of the forklift. (D.E. 87, Ex. L, 64:23-67:7.)

According to Phillips, given the small size of the forklift's wheels, the wood chip became pinned between the wheel and the floor, jamming the wheel's ability to revolve. (*Id.*) Consequently, the forklift stopped suddenly, and Phillips was ejected from the forklift onto the floor through the uncovered opening in the back of the forklift. (*Id.*) Phillips landed in the path of the forklift. (*Id.*) Although the forklift has a "dead-man pedal," which must be depressed for the forklift to be able to move (rendering it impossible, at least theoretically, to have a pilotless, runaway forklift) (*id.* at 33:10-34-a), the forklift's momentum carried it over the lower portion of Phillips's right leg (*id.* at 64:23-67:7). As a result of this trauma, doctors had to amputate Phillips's leg below the knee. (*Id.*)

Phillips brought a products liability action against Raymond. (D.E. 1, Ex. A ¶ 5.) Among other things, Phillips alleged that the forklift was unreasonably dangerous

2

because there was a satisfactory alternate design, specifically a latching-rear door, which would have safeguarded Phillips from the foreseeable event of being thrown from the open operator's compartment when the forklift stopped suddenly and forcefully. (*Id.*)

Phillips retained and now offers John Sevart ("Sevart") and Dr. Y King Liu ("Liu") as experts. Sevart is a mechanical engineer who, among other things, has designed and tested rear entry forklifts. In particular, he has designed a latching-rear door that he maintains should have been present on the Raymond 31i forklift. (*Id.*) Dr. Liu is a biomechanical engineer whose purpose was to testify about the "mechanism" or physics behind Phillips's injury and what the mechanics (or lack thereof) would have been had the forklift had a rear door. (D.E. 87, Ex. J at 8:14-21.) On July 26, 2004, Raymond filed a motion to strike Sevart and Dr. King Liu. (D.E. 85.) The motion alleges that Liu is unqualified to offer opinions relevant to a stand-up forklift (*id.* at 1) and that both Sevart and Liu "can offer nothing more than their subjective beliefs as to the cause of this accident, and propose the addition of John Sevart's allegedly safer alternative design, which each speculates would have prevented the accident." (*Id.*) Raymond's's motion is substantially based on the Seventh Circuit's decision in *Dhillon*, 269 F.3d at 867-70, which affirmed the exclusion of Sevart's testimony in a similar case.

Raymond retained Edward Caulfield ("Caulfield"), a mechanical engineer, and Dr. Catherine Ford Corrigan ("Corrigan"), a biomechanical engineer, to support its contentions that the latching-rear door was not a viable or beneficial alternative design and that Phillips's injury did not occur in the manner he claims. In September 2004, Phillips filed motions to exclude Caulfield (D.E. 96) and Corrigan (D.E. 94). Most of

Phillips's arguments appear to be claims that the methodologies employed by Caulfield and Corrigan were insufficient, misguided, and hence unreliable and misleading to a jury.

## LEGAL STANDARD

Parties are not entitled to present allegedly expert testimony if it is subject to legitimate challenge under the law. Precedent teaches that a district court judge is to act "as a 'gatekeeper' for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability." *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869 (7th Cir. 2001) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1999)); *see also DataQuill Ltd. v. Handspring, Inc.*, No. 01 C 4635, 2003 WL 737785, at *1 (N.D. Ill. Feb. 28, 2003) The gatekeeping function "focuses on an examination of the expert's methodology." *Smith v. Ford Motor Co.*, 215 F. 3d 713, 718 (7th Cir. 2001). Thus, "[t]he soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment." *Id.*

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

*See also United States v. Allen*, 390 F.3d 944, 949 (7th Cir. 2004) (discussing Rule 702). An expert must possess "sufficient specialized expertise to render his opinion on the topic . . . reliable, as required by *Daubert*. [An expert's] competence in the general field [at

4

issue] must extend to his specific testimony on the matter before the Court." *Ty, Inc. v. Pub. Int'l., Ltd.*, No. 99 C 5565, 2004 WL 2359250, at *5 (N.D. Ill. Oct. 19, 2004); *accord Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990).

Once a court determines that an individual is qualified to be considered an expert, it must apply a two-step analysis to determine whether the expert's opinion is admissible. First, a district court must ascertain whether the expert's testimony is reliable, as the Court must "rule out 'subjective belief or unsupported speculation.'" *Riach v. Manhattan Design Studio*, No. 00 C 5883, 2001 WL 1143243, at *3 (N.D. Ill. Sept. 25, 2001) (quoting *Daubert*, 509 U.S. at 590); *see also Walker v. Soo Line R.R. Co.*, 208 F.3d 581, 587 (7th Cir. 2000). The question of admissibility asks whether "there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. v. Joiner*, 522 U.S. 136, 146 (1997).

To be considered scientific, and thus admissible, the testimony must: (1) be based upon sufficient facts or data; (2) be the product of reliable principles and methods; and (3) come from a witness who has applied the principles and methods reliably to the facts of the case. *See* Fed. R. Evid. 702. Factors that may illuminate the analysis include: (1) whether the theory or technique can be and has been verified by the scientific method through testing; (2) whether the theory or technique has been subject to peer review and publication, (3) the known or potential rate of error of the technique, and (4) whether the theory or technique has been generally accepted by the relevant scientific community. *Daubert*, 509 U.S. at 590-91.[2] These factors are merely guides, however, and do not

---

[2]    The first factor, the existence of testing employing a verified scientific method is "a very significant *Daubert* factor"—probably the single most important factor. *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002). Being subjected to publication or peer review is an important indicator, but by no means is it dispositive in determining a methodology's reliability. *See Smith v. Ford Motor Co.*, 215

serve as a series of prerequisites; their applicability depends on the particular facts and circumstances of each case. *See United States v. Cruz-Velasco*, 224 F.3d 654, 660 (7th Cir. 2000). Nonetheless, a court must focus on the principles and methodology, not on the substance generated by the methodology—the latter is the province of the jury.

Second, the court must determine whether the evidence assists the trier of fact in understanding the evidence or determining a fact in issue. *See* Fed. R. Evid. 702. In other words, "[t]he twin requirements for expert testimony are relevance [the second prong] and reliability [the first prong]." *McReynolds v. Sodexho Marriott Svcs.*, 349 F. Supp. 2d 30, 34-35 (D.D.C. 2004) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149-50 (1999)).

A subset of *Daubert*-type expert cases concerns alternate designs, where a party claims that a manufacturer should be liable because a safer, alternate design existed at the time of the accident than the one employed by the defendant's product. Alternative design cases often require potential experts to take into account certain factors, including "the degree to which the alternative design is compatible with existing systems . . .; the relative efficiency of the two designs; the short and long term maintenance costs associated with the alternative design; the ability of the purchaser to service and to maintain the alternative designs; the relative cost of installing the two designs; and the effect, if any, that the alternative design would have on the price of the machine." *Cummins v. Lyons Indus.*, 93 F.3d 362, 369 (7th Cir. 1996). Many of these

---

F.3d 720 (7th Cir. 2000). Courts interpret general acceptance of a method to be a "review of experimental, statistical, or other scientific data generated by others in the field." *Chapman*, 297 F.3d at 688 (citing *Cummins v. Lyons Indus.*, 93 F.3d 362, 369 (7th Cir. 1996)). Unsubstantiated testimony, as opposed to more concrete proof of acceptance, does not ensure that "the expert's opinion has a reliable basis in knowledge and experience of his discipline." *Deimer v. Cincinnati Sub-Zero Prods., Inc.*, 58 F.3d 341, 345 (7th Cir. 1995); *see also Chapman*, 297 F.3d at 688.

considerations are product- and manufacturer- specific and cannot be reliably determined without testing. *See Dhillon*, 269 F.3d at 870.

The party offering the expert's testimony must establish by a preponderance of the evidence that the expert testimony is admissible and that the expert is qualified. *See Daubert*, 509 U.S. at 593; *see also Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) ("[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable."); *Zenith Elecs. Corp. v. WH TV Broadcasting Corp.*, No. 01 C 4366, 2003 WL 21506808, *1 (N.D. Ill. Jun. 27, 2003) ("As the proponent of Shapiro's testimony, WH TV bears the burden of establishing its admissibility by a preponderance of the evidence."). However, the question of whether an expert is "credible or whether [his] theories are correct given the circumstances of [the] case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." *Smith*, 215 F.3d at 719.

## DISCUSSION

As a preliminary matter, the Court is compelled to note that Phillips's lack of citation and willingness to rely on conclusory statements concerning some three-plus feet of exhibits (often with hardly any indication as to why the various filings are relevant) is largely unhelpful to this Court. For example, Phillips's generic cites to "Exhibit 3, Volume 2" in his brief (*e.g.*, D.E. 95 at 7, 9), when Exhibit 3, Volume 2 is comprised of dozens, if not hundreds, of photographs, apparently random charts, and multiple studies amounting roughly to 150 pages worth of garbled information, cannot support the

propositions for which Phillips cites it in any meaningful way. Similarly, Phillips cites generally to "Ex. 25, Vol. 2" for the proposition that some tests conducted by Sevart demonstrated that the existence of a latching-rear door would increase the time of egress from a forklift by one-half of a second. (*Id.* at 9-10.) Exhibit 25, titled generally, "Self Restraint Information" contains roughly fifty pages of various memoranda, the relevance of which is hardly clear. The Court is unable to cite every example of such briefing, but examples abound, including on pages 7, 8, 9, and 10 of Docket Entry 95. On other occasions, Phillips makes factual assertions without providing any citation whatsoever (*e.g.*, *id.* at 7). The Court is unable to consider such factual claims, as they are not independently verifiable.

The Court has endeavored to locate specific citations where possible, but given the size of the record, the task has often been an exercise in futility. *See generally Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 818 (7th Cir. 2004) ("[a] court should not be expected to review a lengthy record for facts that a party could have easily identified with greater particularity"). The Seventh Circuit's teaching is especially relevant when, under Seventh Circuit precedent, the Court must attempt to analyze the nuances of any given test or assertion to determine its relevance and relation to the accident involved in the instant case. (The Court also notes that the proponent of putative expert testimony bears the burden of demonstrating the reliability of its experts' methodology.)

A.    John Sevart

The Court begins by examining Sevart's methodology. Sevart's expertise and methodology were extensively questioned in the Seventh Circuit, namely in *Dhillon v.*

*Crown Controls Corp.*, 269 F.3d 865 (7th Cir. 2001). In *Dhillon*, the Seventh Circuit affirmed the trial court's exclusion of Sevart in a strict liability and negligence action, arising out of injuries sustained in a forklift accident, similar to this case. *See id.* at 871. Sevart's proffered testimony and methodology was almost identical to his methodology and testimony this case: he was brought in to explain how the defendant's forklift was improperly designed because it did not come with a latching-rear door. Consequently, the Court will use *Dhillon* as a roadmap to see if the infirmities in Sevart's methodology found by the Seventh Circuit have been rectified.

Contrary to Phillips's claims, in *Dhillon* the Seventh Circuit found myriad problems with Sevart's methodology. Phillips insists that any problems with Sevart's testimony merely stemmed from the failure of the plaintiff's attorney in that case to add the appropriate information into the record. (D.E. 95 at 3.) However, the Seventh Circuit was troubled by Sevart's utter lack of testing and professional rigor, *Dhillon*, 296 F.3d at 869-70, the fact that the tests he did were performed on a different type of forklift *after* Sevart formed his conclusions, *id.* at 870, and that Sevart did not perform any of the *Cummins* analysis for alternate design cases, *id.* at 870-71. Furthermore, Sevart did not favorably subject his methodology to any peer review and publication, nor could Sevart establish that his design had been accepted for general application by any manufacturer, regulatory body, or standards organization. *Id.*

Phillips unsuccessfully attempts to overcome *Dhillon*'s damaging pronouncements. To attempt to refute Sevart's prior lack of general acceptance (his proposed design appears to have been overwhelming rejected by virtually everyone), Phillips cites to several publications and entities that purportedly support Sevart's

9

assertion that latching-rear doors are generally accepted as necessary. He cites to the Swedish Board of Occupational Safety and Health, an unnamed patent applicant, a 1989 edition of a forklift operator's manual, trade magazines, ten (unnamed) forklift manufacturers who "provide a rear post or rear door at [sic] standard equipment," an uncited report from 1977, and the fact that Crown, another forklift manufacturer, makes a forklift with a rear door. (D.E. 95 at 5-6.) Finally, Phillips maintains that the American National Standards Institute's ("ANSI") overwhelming rejection of Sevart's proposed design is based on bias and fear, since the chairman of the committee "is a Raymond employee and 28 of the 31 members are employees of . . . entities who have a vested financial interests in resisting mandatory improvements for forklifts." (*Id.* at 5.)

None of these arguments are helpful to Phillips. Particularly in light of the lack of *any* compelling evidence to the contrary, the Court puts little stock in Phillips's conspiracy theory concerning the ANSI. (As the Seventh Circuit noted in *Dhillon*, "Sevart has twice tried to persuade the professionals on the American National Standards Institute Committee to require a rear door; the committee has twice rejected the idea." *Id.*, 269 F.3d at 870-71.[3]) Similarly, the existence of a single patent application is not helpful to Phillips, as it is not indicative of any meaningful acceptance within a relevant scientific or design community and the patent appears to concern a mesh guard, not a latching-rear door, in any event. The Crown forklift with a rear door is for freezers only and is "not for general warehouse use." Ex. 20, Vol. 2. This evidence would appear to cut against Sevart, not in his favor. None of the trade magazines offered by Phillips

---

[3]     When Sevart first attempted to persuade ANSI to adopt his proposed design in 1987, the proposal was voted down 16-1. (Vol. 2, Ex. 34 at 4-5; *see also* D.E. 87, Ex. C at 196:3-7.) The only supporting vote came from Sevart's employee, Tom Berry. (Vol. 2, Ex. 34 at 4-5.) In Sevart's second attempt to persuade the ANSI committee to accept his rear door proposal in 1995, Sevart failed ever to receive a second for his motion to put his proposal up for a vote. (D.E. 87, Ex. C at 197:1-12.)

discuss *latching*-rear doors, nor do they indicate that the rear doors are standard or non-optional features. As for the "ten forklift manufacturers," that claim is imprecise and unhelpful, because it includes forklifts with a "rear post," which is not at issue here; in this regard, it is unclear how many, if any, of the ten manufacturers offer rear doors as opposed to rear posts. As for the "Swedish OSHA" study, the Court cannot locate the Swedish study cited by Phillips (he cites to "Ex. 46, Vol. 2," but Volume Two does not appear to contain any exhibit forty-six, and instead contains only forty exhibits.[4]). Finally, the operator's manual, to the extent it speaks meaningfully to doors at all, discusses rear doors in the context of "reach trucks." (Vol. 2, Ex. 18.) The snippet of discussion concerning "reach trucks" appears in a subsection entitled "unique vehicles," and this subsection is distinct from the section addressing "fork lift trucks and transtackers." This manual, which is an operator's manual and not any design analysis, has no apparent relevance, and it certainly has no explained relevance as it relates to forklift design. None of these materials, individually or collectively, would suggest that the sensible course is to depart from the path set forth in *Dhillon*.

Relatedly, Phillips unsuccessfully seeks to answer previously identified concerns about Sevart's methodology. He cites a compilation of forklift accidents (D.E. 95 at 7-8), Raymond's history of litigation (*id.*), and multiple tests of stand-up forklifts (*id.* at 9). The first two grounds have little relevance to the present case, especially given their cursory treatment in the briefing. Sevart's invocation of multiple tests is similarly

---

[4] The Court, through its clerk, has endeavored to clarify the extent of the first two volumes of Phillips's exhibits. (Nothing in the clerk's office or Court's files appears to reflect any exhibit 46.) The Court's clerk contacted Phillips's counsel and received assurance that the relevant information, if any, would be forthcoming. As of the issuance of this opinion, Phillips's counsel has not responded to the Court's queries, and the time has passed in which Phillips's counsel indicated he would do so. In any event, as explained herein, there are a number of diverse shortcomings concerning Sevart that all point to exclusion of his testimony in light of *Dhillon*. The single Swedish OSHA issue is not material.

unavailing because the citation, "Ex. 3, Vol. 1," is too unspecific, since exhibit three is a *140 page deposition*. Furthermore, the tests appear to have occurred after Sevart made up his mind about the desirability of the latching rear door forklift. *See Dhillon*, 269 F.3d at 870 (criticizing Sevart on such basis). Notwithstanding Sevart's rejection by the Seventh Circuit in *Dhillon*, Sevart performed no new tests for the instant case, D.E. 87, Ex. C, 206:15-23, instead relying on the tests previously criticized because they were done after Sevart reached his conclusions about the rear-door forklift. In addition, Phillips's briefs only discussed the conclusions of the tests, not their underlying methodology.

Furthermore, Phillips's discussion of the egress time for a latching-rear door is misplaced, as escape is only one small, tangential issue. (D.E. 95 at 9-10.) To the extent it is relevant to Phillips's briefing, it may be that in this one regard the latching-rear door does not make the forklift more dangerous, but that does not mean that a forklift without a latching-rear door is inherently unsafe or less safe overall than a forklift with a latching door.

Simply put, Sevart has not persuaded the Court concerning any of the *Daubert* factors—just as was the case in *Dhillon*. There is no apparent peer review or publication of Sevart's methods. Sevart's "analysis" amounts to little more than a series of foregone and conclusory assertions that are not supported by serious documentation, peer review, or acceptable testing. Furthermore, Sevart's method did not include any testing to indicate whether his design would be feasible, and he never created or tested a prototype or other tangible demonstration of his design. (D.E. 87, Ex. C 83:19-22; 84:1-3; 185:4-187:2.) Sevart's testing also appears to treat a rear door and a rear guard or post as interchangeable without any substantiation or justification. (*See id.* at 96:17-97:3.)

Additionally, Sevart did not conduct any new tests after the Seventh Circuit's decision in *Dhillon*, and in *Dhillon* the Court concluded that all his previous tests had occurred after he had already made up his mind about a rear door forklift design. *Dhillon*, 269 F.3d at 870. It is difficult to understand how Sevart could seek to testify under such circumstances. Sevart also did not abide by the steps he himself believed a design engineer should take before reaching an opinion concerning a marketable and safe design. (*See* D.E. 87, Ex. C at 183:15-187:2.)

Moreover, Sevart's methodology and design have not been generally accepted. Plaintiff's design has been overwhelmingly and resoundingly rejected by the only design community discussed and he has not established that any other manufacturer offers his design as a standard feature. (*Id.* at 201:20-202:4.) Moreover, Sevart spends no time discussing (or, apparently, satisfying) any of the factors the Seventh Circuit stated that an expert "needs to look at" in alternative design cases, including applicable costs, efficiency calculations, or compatibility issues. *See Cummins*, 93 F.3d at 369. As a result, the Court echoes Judge Lindberg's concern in *Dhillon*:

> While the record is replete with Mr. Sevart's opinions regarding the relative safety of [a stand-up forklift] equipped with a door in comparison with the safety of a [stand-up forklift] lacking a door, Plaintiff has not indicated to the Court the place in the record [nor, for that matter, do those portions of the record cited demonstrate the existence of] a sufficiently reliable scientific methodology in reaching his conclusions.

*Dhillon v. Crown Controls Corp.*, No. 99 C 4428, 2000 WL 420747, at *4 (N.D. Ill. Mar. 14, 2000). Accordingly, Raymond's motion to exclude Sevart is granted.[5]

---

[5]     Although not addressed in Phillips's briefs concerning Sevart, in briefing concerning a different expert, Phillips suggests a *Daubert* hearing for that expert if the Court is disinclined to allow the expert. (D.E. 93 at 12.) Phillips makes this argument in briefing concerning his biomechanical expert, Dr. Liu, but he did not do so in briefing concerning Sevart, despite the Court's having allowed extraordinary briefing and despite the fact that Phillips often made duplicative assertions and used duplicative quotations within

13

B.    Dr. Y King Liu

Phillips retained Dr. Y King Liu to address two issues: (1) the mechanism of injury to Phillips as a result of the accident as it occurred and (2) what the extent and mechanism, if any, of Phillips's injury would have been had the forklift had a latching-rear door of the type promoted and endorsed by Sevart. (D.E. 87, Ex. J at 8:14-21.) After reviewing the relevant information, the Court concludes that Dr. Liu may testify concerning the first issue, but he may not do so regarding the second, as it is derivative of the excluded Sevart testimony.

The first question for this Court is whether Liu is qualified to be an expert. Unlike with Sevart, Raymond maintains that although Liu is "an experienced biomechanical engineer, he is not qualified to give testimony in this forklift design case" because his expertise "does not 'fit' the facts of this case." (D.E. 99 at 14-15.) The Court rejects Raymond's position and concludes that Liu is, in fact, qualified. He is a professor of biomechanical engineering (D.E. 87, Ex. J at 6:6), he is the founder and president of the University of Northern California (*id.*, Ex. K at 2), and he has testified at over 100 depositions or trials (*id.*, Ex. J at 7:3-20). While Liu may not have thorough experience with injuries resulting from forklifts, his knowledge and experience as a biomechanical engineer is enough for him to testify on the mechanics of the injury in this case. Liu need

---

his various briefs. Consequently, this argument is waived as to Sevart. Even if it were preserved, however, it would fail. It is axiomatic that while *Daubert* hearings may, in some instances, be recommended, they are not required. *See Kirstein v. Parks Corp.*, 159 F.3d 1065, 1067 (7th Cir. 1998) ("We have not required that the *Daubert* inquiry take any specific form and have, in fact, upheld a judge's *sua sponte* consideration of the admissibility of expert testimony."); *see also Group Health Plan, Inc. v. Philip Morris USA, Inc.*, 344 F.3d 753, 761 n.3 (8th Cir. 2003) (collecting cases). The only requirement is that the parties have "an adequate opportunity to be heard." *Group Health Plan*, 344 F.3d at 761 n.3. In this case, Phillips has been granted extraordinary briefing substantially beyond that presumptively allowed under local rule. *See* L.R. 7.1. No hearing is required to have the parties confirm the deficiencies with Sevart's testimony reflected in the extensive evidentiary record in this case and in Seventh Circuit precedent specifically concerning Sevart.

not be an expert in the specific machine involved with an injury if, taking the circumstances of the injury as true, he uses an appropriate methodology to discuss the extent and manner of the injury.

Having determined that Liu is a qualified expert, the Court now must determine whether his testimony is reliable. Raymond's first contention is that Liu's testing was improperly "designed for the courtroom" since it discusses what the likely injuries would be when a body is ejected from a forklift, as opposed to replicating the facts of the case to determine whether a person would actually be ejected. (D.E. 99 at 12.) This allegation is ultimately immaterial, as Raymond seems to misconstrue the purpose for which Phillips offers Liu, a biomechanical engineer. That Liu only conducted tests in accordance with Plaintiff's version of the events—testing the likely injuries to a dummy that falls out of a forklift—is unobjectionable, since the purpose of the test was to understand the human impact of falling out of a forklift. In other words, Liu addresses what would have happened to Phillips (*i.e.*, how a person might be injured) when he fell out of the forklift as he claims he did. (*See* D.E. 87, Ex. K at 1.) The purpose is not to verify Phillips's version of the events. Thus, hitting a wood chip (or any other solid mass on the floor) with such force that a person could be ejected from a forklift is a prerequisite to Liu's analysis. Liu does not address whether Phillips reasonably could fall out of a forklift as Phillips contends, but rather what would happen to a person if he were ejected from the forklift. Raymond is free to argue at trial that the jury should not put much weight in Liu's study since its results do not adequately shed light on the instant case before the trier of fact. But the Court respectfully rejects Defendant's invitation to exclude this aspect of Liu's testimony.

Furthermore, Liu's lack of a hypothesis during the time of the tests is similarly not troublesome on the facts of this case. (D.E. 87, Ex. J at 340:10-15.) Dr. Liu maintained, and this Court agrees, that the nature and objective of the test did not lend itself to requiring a hypothesis. *See id.* Finally, unlike the cases Raymond attempts to treat as related to the instant case, such as *Chapman v. Maytag Corp.*, 297 F.3d 682 (7th Cir. 2002), here Liu has produced multiple studies and tests, has offered more than his own opinion, and is supported by modern technology and scientific methodology. (D.E. 93, Appendix A.)

Raymond next argues that Liu's testimony is unreliable because it has been the subject of no peer review or publication. (D.E. 87, Ex. J at 343:22-344:5.) This absence, however, is not determinative on the facts of this case. The briefs demonstrate that the particular tests performed by Liu were specialized to the facts of this case as alleged by Phillips and thus were not worthy of industry-wide analysis or peer review. "Without a further explanation of the connection between lack of publication and reliability *in this case*, [the Court] cannot determine the extent to which this factor bears on the reliability of the methodologies used by [Liu]." *Smith*, 215 F.3d at 720 (emphasis added).

The Court notes that, unhelpfully for Phillips, it appears that the potential rate of error of Liu's calculations is unknown. Apparently, for Liu to be able to determine the rate of error for his tests (thus helping to make them scientifically valid), he would have had to engage in a "retrospective analysis." (D.E. 87, Ex. J at 321:20-24.) Liu did not conduct such a "retrospective analysis." (*Id.* at 321:20-24, 322:10-323:215.) Thus, Liu cannot provide a potential rate of error. This cuts against admissibility.

Also unhelpful to Phillips is the issue of whether Liu meets the fourth *Daubert* factor—general acceptance. Phillips asserts that Liu meets this prong of the *Daubert* review. (*See* D.E. 87, Ex. J 60:6-25-7:10 (arguing that Liu's testing meets all the standards of the Society of Automotive Engineers and the International Organization for Standardization); D.E. 93 at 15 (asserting that "the testing performed by Dr. Liu has been accepted in the industry as the gold standard in evaluating the biomechanical forces on the human body in crashes. (Appendix A1).").) Despite Phillips's assertions, his actual support often devolves again to generalizations and conclusions unsupported by cited fact. Liu provides nothing more than his own opinion as to the acceptability of his own tests. It would have been helpful if Phillips had demonstrated what the SAE or ISO standards are, for example. Unsubstantiated testimony, such as this, does not ensure that "the experts's opinion has a reliable basis in knowledge and experience of his discipline." *Deimer*, 58 F.3d at 345; *see also Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002).

However, the Court is mindful of the teachings of the Seventh Circuit, namely that the district courts are not beholden to the four *Daubert* factors—a case-by-case analysis is often in order. *See Cruz*-Velasco, 224 F.3d at 660. In this case, for the purposes of the first issue, many of the *Daubert* factors are largely inapplicable. The tests conducted by Liu seem very basic, using straightforward (albeit somewhat intuitive) procedures to arrive at a general conclusion, regardless of whether they are actually "the gold standard." Phillips should have better supported his allegation that Liu's methods were in accordance with the "gold standard of the industry." However, given the simplicity of issue to be addressed and the tests Liu conducted, the Court finds that Liu

passes the *Daubert* standard for the limited purpose of determining, in his opinion, how Phillips sustained his leg injuries. *See United States v. Brumley*, 217 F.3d 905, 911 (7th Cir. 2000) (holding that the Supreme Court in *Kumho Tire* "explained that the Daubert 'gatekeeper' factors had to be adjusted to fit the facts of the particular case at issue, with the goal of testing the reliability of the expert opinion.").

Since Liu's tests are sufficiently reliable, albeit barely, the Court turns to the second prong: determining whether the testimony can help the trier of fact to understand the evidence. The Court is not persuaded that Dr. Liu's testimony with regard to issue one, the mechanism of Phillips's actual injury, is irrelevant. The trier of fact is charged, ultimately, with determining whether Raymond should be liable for Phillips's injuries. Determining how Phillips hurt his leg is central to that determination, and helpful to the jury's attempt to piece together the relevant evidence. *See generally United States v. Hall*, 165 F.3d 1095, 1102 (7th Cir. 1999); *Smith*, 215 F.3d at 717. The Court does not pass judgment on Dr. Liu's testimony; the trier of fact may or may not agree with his view of how Phillips injured his leg, but this is not an issue for the Court. It will be up to the trier of fact to assess, in light of the flaws Raymond believes it has identified, what significance to place on Dr. Liu's testimony. *See Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 362-63 (7th Cir. 2001).

In contrast, the Court does not find Liu's testimony relevant with regards to his second charge: determining what the mechanism of Phillips's injury would have been if the forklift was equipped with Sevart's latching-rear door. Since the ultimate issue and all germane tests were premised on and relied on Sevart's findings and proposals (D.E. 87, Ex. J 10:20-24; 11:2-4; 11:8-11; 144:16-25), which are inherently unreliable and

inadmissible, it would be affirmatively unhelpful for Liu to offer testimony discussing tests on an essentially non-existent alternative design. Therefore, Raymond's motion to strike Liu's testimony is granted with regard to any statements he might make concerning hypothetical injuries (or lack thereof) relating to Sevart's testimony and design. Raymond's motion is denied as to Liu's explanation of the mechanism of Phillips's actual injury in the case with the Raymond forklift.

C.    Dr. Catherine Ford Corrigan

Raymond seeks to introduce the testimony of Dr. Catherine Ford Corrigan, a biomechanical engineer. Raymond asked Corrigan to "evaluate the motions and forces associated with Mr. Phillips's injuries, and to address biomechanical issues associated with the use of a rear door on the Raymond 31i-DR45." (Def. Opp. to Excl. of Corrigan, Ex. 2 at 1.) In other words, Corrigan had to (1) evaluate, from a biomechanical perspective, the nature of Phillips's injuries, the mechanism of his injury and the occupant kinematics to reconstruct the accident, and (2) analyze the biomechanical issues surrounding the existence of a rear door for the Raymond 31i-DR45, the type of forklift involved in Phillips's accident. (*Id.* at 3.)

Corrigan's qualifications entitle her to testify about the two aforementioned areas. Corrigan has a Ph.D. in medical engineering, after participating in a combined doctoral program at Harvard and the Massachusetts Institute of Technology ("MIT"), and she also obtained a masters degree in mechanical engineering from MIT. (*Id.*, Ex. 1 at 1.) She is currently the Principal Engineer in the Biomechanics Practice at Exponent Failure Analysis Associates, where she specializes in human tolerance, occupant kinematics, bone and fracture mechanics, and rigid body mechanics. (Pl. Ex. 5, Vol. 1 at 68:6-15.)

19

She also serves as a visiting Lecturer at Princeton University. (Def. Opp. to Excl. of Corrigan, Ex. 1 at 1.) In addition to being member of various biomechanical societies, Corrigan is a reviewer for the Journal of Biomechanics. (*Id.*) She has also published multiple articles concerning bone mechanics and the mechanism of injuries. (*Id.* at 2.) Given this extensive experience, Corrigan is qualified to testify about Phillips's injury and related biomechanical issues.

To place Phillips's complaints concerning Corrigan in context, and to undertake a *Daubert* analysis, the Court must review Corrigan's methodology. She reviewed roughly twenty-nine categories of documents that were sent to her, including accident statements, the reports of Sevart and Liu, diagrams of the accident site, other experts' inspection and testing notes, various regulations, photos and testing data from Dr. Liu's testing, and Phillips's medical records and radiographs. (*Id.*, Ex. 2 at 1-2.) Dr. Corrigan was qualified to analyze these documents given both her education and her extensive training in radiological anatomy. (Pl. Ex. 5, Vol. 1 at 88:17-89:6.) She also, through her associates, inspected and took measurements of two exemplar Model 31i forklifts. (*Id.* at 175: 9-182:4.) Corrigan used this information to study the geometry of the Raymond forklift and how it interacted with injury mechanisms. Furthermore, to supplement her knowledge, Dr. Corrigan reviewed a considerable amount of medical literature. (*Id.* at 17:20-18:14.) For the second part of her objective, Corrigan used computer simulations and historical testing of stand-up rear entry forklifts regarding alternative designs. (*Id.* at 19:7-24; 220:3-221:3.) Finally, she applied all this information to this case using her experience, training, knowledge, and understanding of principles of human tolerance, biomechanics and physics in order to reach her conclusions. (*Id.* at 229: 1-14.)

Phillips offers several objections to Corrigan's testimony. First, he attempts to attack her methodology. Phillips alleges that Corrigan did not adopt any specific, scientifically valid, biomechanical method; instead, Phillips contends, Corrigan relied on mere "background and experience" and impermissible factors, thus rendering Corrigan's opinion nothing more than *ipse dixit*. (D.E. 94 at 1.) The Court respectfully disagrees. First, the process of analyzing assembled data while using experience to interpret the data is not illicit; an expert need not actively conduct his or her own tests to have a valid methodology. *See, e.g., Clark v. Takata Corp.*, 192 F.3d 750, 758 (7th Cir. 1999) (holding that either "hands on testing" or "review of experimental, statistical, or other scientific data generated by others in the field" may suffice as a reasonable methodology upon which to base an opinion). Thus, Corrigan's review of others' human testing was a valid methodology that legitimately led to her conclusion that the operator, under the same or similar circumstances described by Phillips, could not have been forcibly ejected from the forklift. (Def. Opp. to Excl. of Corrigan at 10.)

Second, Phillips maintains that Corrigan failed to engage in an objective analysis by improperly reaching opinions on witnesses' credibility, namely by concluding that the version of events Phillips alleges did not and could not have happened. However, it is not improper for Corrigan to have subjected Phillips's version of the facts to a rigorous analysis. Coming to her conclusion, Corrigan relied on objective analysis, test results, and medical records. As a result, she came to a conclusion at odds with Phillips's testimony and theory of the case. This version may or may not be accepted by the jury, and Phillips is certainly free to attempt to undermine Dr. Corrigan by cross-examining her. But Phillips's objection to Corrigan is not well taken.

21

Finally, Phillips alleges that Corrigan failed to measure or to quantify various factors and otherwise relied on factual inaccuracies in her testing and analysis. (D.E. 105 at 7.) In short, Phillips complains about the accuracy of Corrigan's conclusions. However, the miscalculations and inaccuracies Phillips contends he has identified go to the weight of the evidence and not its admissibility. They are not a basis to exclude Corrigan. *See Smith*, 215 F.3d at 719.

The other *Daubert* factors are not disabling with respect to Corrigan's proffered testimony. The lack of peer review for Corrigan's research and analysis in this case is inconsequential, as the testing she conducted applied directly to this case and its specifics. (*See* discussion, *supra*, concerning Dr. Liu.) Also, Raymond has not demonstrated that there was general acceptance for Corrigan's testimony. However, there is no one singular, strict methodology in the industry (Pl. Ex. 4, Vol. 1 at 229: 18-20), so the importance of general acceptance is reduced. More importantly, however, Corrigan's general methodology—gathering relevant information and applying one's training, experience, and knowledge to a process of analyzing the information is a matter of common sense, and it has been deemed "reasonable" (and thus, presumably, acceptable) by the Seventh Circuit. *See, e.g., Clark*, 192 F.3d at 758. Finally, as with Dr. Liu's testimony, Dr. Corrigan's testimony is relevant. Dr. Corrigan's analysis and testimony will shed light on the biomechanics of Phillips's injury and the biomechanics of the event had the Raymond forklift been equipped with a rear door.[6]

---

[6] In this regard, Corrigan's testimony resembles Liu's, rather than Sevart's. Corrigan, like Liu, merely discussed the biomechanics of Plaintiff's injury. This is much more conducive to applying scientific principles and equations than Sevart's attempted task. Moreover, Corrigan has been much more concerned with the evidence and statistics germane to the instant case; she has conducted and analyzed tests and data about *this* case, whereas Sevart has conducted no new tests and instead relies on general principles that have been affirmatively rejected by the relevant community and the Seventh Circuit.

D.    Edward Caulfield

Raymond retained Dr. Edward Caulfield, President and Chief Technical Officer of Packer Engineering, Inc., to investigate Phillips's accident and to assist with relevant technical issues. (Pl. Ex. 1, Vol. 1 at 10:12-23.) Specifically, Caulfield reviewed the background file, conducted multiple inspections and analyses of the accident site, and conducted multiple tests of forklifts and human tolerance. (Def. Opp. to Excl. of Corrigan, Ex. 4 at 2-3.) This work appears to have built on prior studies Caulfield has done in this area.

Most relevant to the instant motion are three general categories of tests Caulfield conducted: (1) five tests and an informal survey[7] in 1987 whose purpose was to "quantify and measure" the injury levels "if a person were to go off a dock in a forklift and stayed with the machine during the off the dock event and not step off" (Pl. Ex. 1, Vol. 1 at 22:12-18); (2) a 2000 test essentially identical to the one Caulfield conducted in 1987 (Pl. Ex. 1, Vol. 1 at 20:15-21:23); and (3) a test in 2003 designed to replicate Phillips's accident scenario to "determine whether relative displacement of the operator . . . occurred as a result of collisions" with wooden objects on the floor (*id.* at 151:21-153:11; 154:13-160:17). He concluded that the design and manufacture of the Raymond forklift did not cause the accident. (Def. Opp. to Excl. of Corrigan, Ex. 4 at 6.)

Dr. Caulfield is qualified to testify as an expert. He has a Ph.D. in Theoretical and Applied Mechanics from the University of Illinois. He served as an assistant professor in the Department of Mechanical Engineering at the University of Illinois. He has twenty-five years of industrial experience, he has had multiple articles published, and

---

[7]    The goal of the survey was to obtain information from actual forklift users on their experience with off-the-dock events and injuries. (Pl. Ex. 1, Vol. 1 at 29:5-12.) The users interviewed were randomly selected "more or less" from large and small forklift fleet users. (*Id.* at 89:7-17.)

he has served and been qualified as an expert many times. (Def. Opp. to Excl. of Corrigan, Ex. 3 at 1-3.)

Phillips takes issue with Caulfield's 1987, 2000, and 2003 tests and the 1987 survey. As a preliminary matter, the Court notes that the purpose and direction of Phillips's motion to strike Caulfield is unclear (*e.g.*, D.E. 96 at 4); it appears as though the motion is an attempt to reargue Raymond's motions to exclude Liu and Sevart or to litigate the ultimate issue of the safety and advisability of rear doors (*e.g.*, *id.* at 6). Since the page limits for a briefing cycle are properly respected, the Court will not consider the arguments purporting to defend Liu and Sevart when ruling on the motion to strike Caulfield. (In this regard, the Court notes that Phillips initially failed to file timely any motions to strike Caulfield or Corrigan. While to Court gave Phillips leave to file belated motions concerning Raymond's experts after Raymond's motions already had been timely filed, Phillip's motions are not properly employed to filibuster concerning Sevart and Liu.)

With respect to Phillip's arguments concerning Caulfield, Phillips first argues that his survey is unreliable and inadmissible. Phillips asserts that the survey, "one of the primary bases of Caulfield's opinions," did not use proper statistical analysis, was generally unscientific, and did not take into account a variety of factors. (D.E. 106 at 3-4.) In short, Phillips argues the survey does not pass *Daubert* scrutiny. However, Phillips's invocation of *Daubert* is, respectfully, misplaced. Raymond does not submit the survey, nor did Caulfield conduct the survey, to demonstrate any statistical significance. Rather, its purpose was simply as generic background information. The survey was simply one piece of information that helped Caulfield form his opinions with

regard to the 1987 testing as a whole. Raymond also has not claimed, and will not attempt, to offer the survey as a statistically conclusive sample.

Phillips also argues that the 1987 and 2000 tests are unreliable. He claims that Caulfield failed to consider certain facts (such as human reaction time), relied heavily on the allegedly infirm survey, did not subscribe to an acceptable methodology, and that the tests do not sufficiently fit the facts of the case. (D.E. 96 at 8-14; D.E. 106 at 6-7.)

The Court does not concur with Phillips's arguments. First, Phillips provides no factual support for his assertion that the survey played a commanding role in the 1987 test or that that the entire test is somehow meaningfully tainted so as to render Caulfield's testimony inadmissible.[8] Furthermore, Phillips's quarrels with Caulfield's inclusion or rejection of certain factors or calculations (such as grip strength), implicate his conclusions and are thus properly left for exploration through cross-examination. *See, e.g., Tungate v. Bridgestone Corp.*, No. IP 02-0151-C H/K, 2004 WL 771191, at *4 (S.D. Ind. Mar. 26, 2004) (Hamilton, J.) (discussing and quoting *Daubert*). Although Phillips has perhaps identified arguments that might undermine the persuasiveness of Caulfield's testimony, the alleged flaws that Phillips identifies do not rise to the level of warranting exclusion of Caulfield's testimony. *See Daubert*, 509 U.S. at 596. Moreover, Caulfield

---

[8] As support for his position, Phillips relies on *Menasha Corp. v. News America Marketing. In-Store, Inc.*, 354 F.3d 661 (7th Cir. 2003). In *Menasha*, the seller of at-shelf coupon dispensers brought an anti-trust action against a competitor. A journalist, Tenser, conducted a "survey" (he asked friends what kinds of coupons they preferred), and Menasha's marketing expert, Langenfeld, depended heavily on the survey. *Menasha*, 354 F.3d at 664. The Seventh Circuit affirmed the district court's ruling that the survey was inadmissible. However, the district court held that Langenfeld "based his opinion . . . on numerous sources of information independent of Tenser's flawed survey" pursuant to Rule 703 and refused to exclude Langenfeld's opinion in its entirety, even though it found Tenser's survey inadmissible. *Menasha Corp. v. News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1030-31 (N.D. Ill. 2003). The same principle is at work here. It just so happens that in *Menasha*, rejection of the survey caused Langenfeld's report effectively to collapse because it was "heavily dependent on Tenser's survey." *Menasha*, 354 F.3d at 664. In the instant case, Caulfield's report and test were not so heavily dependent on the survey, and, consequently, his report and testing (including additional testing specifically directed towards the facts of this case) remain viable.

conducted numerous tests (D.E. 100 at 4), used state-of-the-art equipment (similar to the equipment Liu used) (Pl. Ex. 1, Vol. 1 at 20:15-21:23), and used methods that comport with, rely on, and act in conjunction with other reliable studies (*id.* at 59:4-63:9). The tests also appear to be generally accepted in the industry. (*Id.*, Ex. 24, vol. 2, Ex. 4, vol. 3; Ex. 1, Vol. 1 at 63:10-66:6.)

The tests are also relevant. That the 1987 and 2000 tests concerned step off or off-the-dock accidents,[9] while the instant case did not, is not material. When taking into account an alternative design, such as a latching-rear door, the Seventh Circuit teaches that the parties should be cognizant of the entire impact of the new design. *See Cummins*, 93 F.3d at 369. Off-the-dock accidents appear to be a foreseeable occurrence in the industry, and thus should factor into any consideration of the net benefit of a new design.

Phillips also asserts that the 2003 forklift tests are "unreliable, do not fit the facts of this case and contradict the witness's own methodology," but he provides no support for this assertion. (D.E. 96 at 14.) Caulfield demonstrated that his methodology is proper; he conducted multiple tests, relied of myriad sources, and recreated the accident as described by witnesses. (D.E. 100 at 6.) His methodology was reliable, and Phillips apparently has no complaints with it.

In sum, Caulfield's methods and results were discernible, clear, and rooted in real science. Put differently, they were empirically testable and "intellectually rigorous." *Kumho Tire*, 526 U.S. at 152. As such, they are unlikely to give the jury a misguided impression, since they are subject to effective cross-examination by Phillips, possibly

---

[9]     According to Raymond, off-the-dock accidents occur either "when an operator inadvertently drives the forklift too close to the dock and the forklift goes aver the edge into the pit below" or when "the driver of the tractor trailer drives away from the dock while the forklift is entering or exiting the back of the trailer and is caught between the dock plate and the edge of the trailer and falls between them." (D.E. 100 at 3 n.2.)

using many of the same arguments he used in his motion to strike. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1346 (11th Cir. 2003). Phillips can question vigorously Caulfield's results as he sees fit, and Raymond will almost certainly try to bolster Caulfield's testimony by demonstrating how the figures are allegedly calculated correctly. This all is a matter of the weight of the testimony, not its admissibility. Consequently, Phillips's motion to strike Caulfield's testimony is denied.

A final issue remains. Phillips has explicitly attempted to link the fate of Sevart's and Caulfield's testimony by drawing purported parallels between their professional qualifications and methodologies. (*e.g.*, D.E. 106 at 8.) The attempt is misplaced. Caulfield is a recognized leader in his industry who has published dozens of articles, and made actual tests, observations, and inspections designed around this litigation. His methods and conclusions are supported by the work of others. In fact, Phillips even appears to recognize the validity of at least some of Caulfield's tests, since he made no cogent objection to the 2003 test. Sevart, on the other hand, has published nothing about his latching-rear door, of which he has been a proponent for almost a decade, notwithstanding that his views have been overwhelming rejected by "the professionals on the American National Standards Institute committee." *Dhillon*, 269 F.3d at 870. (*See also* D.E. 87, Ex. C at 192:5-13.) Sevart has even been the subject of a Seventh Circuit opinion affirming his exclusion under *Daubert* in exactly this type of case, and Sevart does not contend that he did anything in response to *Dhillon* to address the numerous deficiencies concerning his testimony highlighted in that precedent. (D.E. 87, Ex. C 206:15-23.) Sevart does not contend that he prepared new tests for this litigation.[10] (*Id.*

---

[10]     In fact, Sevart did not even inspect the accident site or the forklift involved in Phillips's accident. (D.E. 87, Ex. C at 129:16-22.)

at 83:19-22; 84:1-3; 185:4-13; 185:4-187:2.) Sevart's testimony is, in substance, a recapitulation of already-rejected ideas and principles. The Court cannot see how Sevart and Phillips can contend that the Court should reasonably exercise its discretion so as to excuse all of Sevart's previously identified flaws and be a witness in the case *sub judice*. This Court will exercise its discretion (to the extent there is any reasonable discretion in this instance) to follow *Dhillon* and to preclude Sevart.

### CONCLUSION

For the foregoing reasons, Raymond's Motion (D.E. 85) is granted in part, but denied as to Dr. Liu's testimony regarding the mechanism of Phillips's injury that is not related to the Sevart testimony. Phillips's Motions (D.E. 94 and D.E. 96) are denied. So Ordered.

Mark Filip
United States District Judge
Northern District of Illinois

Date: _March 24, 2005_